
FILED
JUN 1 3 2005
CLERK

UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

WESTERN DIVISION

| | | |
|---|---|---|
| PAUL A. WOJEWSKI, M.D., | ) | CIV. 05-5007-RHB |
| | ) | |
| PLAINTIFF, | ) | |
| | ) | |
| vs. | ) | |
| | ) | MEMORANDUM OPINION |
| RAPID CITY REGIONAL HOSPITAL, INC., | ) | AND ORDER |
| CHARLES HART, M.D., AND ROBERT | ) | |
| GLENN ALLEN, JR., M.D., | ) | |
| | ) | |
| DEFENDANTS. | ) | |

I.   Introduction .................................................. 1
     A.   Factual and Procedural Background ....................... 2

II.  Summary Judgment Standard ................................... 5

III. Discussion ................................................... 6
     A.   Count II: Violation of Title I of the ADA–42 U.S.C. § 12112(a) ..... 7
     B.   Count V: Violation of the Rehabilitation Act–29 U.S.C. § 794(a) .. 11
     C.   Count III: Violation of Title III of the ADA–42 U.S.C. § 12182(a) ... 14

IV.  Conclusion ................................................. 18

I.   Introduction

This matter is before the Court on defendants' motion to dismiss, or, in the alternative, for summary judgment. Plaintiff has responded and the matter is ripe for this Court's review. The Court has considered all documents submitted by the parties, thereby converting defendants' motion to dismiss into a motion for summary judgment. The Court has jurisdiction to decide this matter pursuant to 28 U.S.C. §§ 1331, 1343, and 1367(a). For the following reason, defendants' motion for summary judgment is granted.

### A. Factual and Procedural Background

Plaintiff Paul Andrew Wojewski, M.D., ("Dr. Wojewski") lives in Rapid City, South Dakota, and is a cardiothoracic surgeon. (Pl.'s Statement of Material Facts ("PSMF") ¶¶ 1, 6.) Dr. Wojewski became a member of the Rapid City Regional Hospital ("RCRH") Medical Staff on or about January 1988. (PSMF ¶ 7.) This entitled plaintiff to use the hospital's facilities, admit patients, and perform surgery at RCRH. (Defs.' Amended. Stat. Mat. Facts ("DASMF") ¶ 15; Pl.'s Resps. Defs.' Amended. Stat. Mat. Facts ("Pl.'s Resp.") ¶ 15.) Medical Staff membership required Dr. Wojewski to provide appropriate patient care, abide by the Medical Staff bylaws, prepare required medical records, abide by ethical principles, attend an orientation program, and participate in continuing medical education. (DASMF ¶ 16; Pl.'s Resp. ¶ 16.) Plaintiff also agreed to take calls from the RCRH emergency room for heart-related emergencies. (DASMF ¶ 17; Pl.'s Resp. ¶ 17.)

Dr. Wojewski billed patients directly for his services and patients paid him directly for his work, including the work he performed on call. (DASMF ¶ 19; Pl.'s Resp. ¶ 19.) RCRH did not bill patients for Dr. Wojewski's services, nor did the hospital pay Dr. Wojewski for his services. (DASMF ¶ 20; Pl.'s Resp. ¶ 20.) RCRH did not issue a form W-2 or 1099 to Dr. Wojewski, nor did it pay his social security or other benefits, such as health or malpractice insurance. (DASMF ¶ 21; Pl.'s Resp. ¶ 21.) As a member of the Medical Staff, Dr. Wojewski could have hospital employees such as nurses assist him in surgery. (DASMF ¶ 23; Pl.'s Resp. ¶ 23.) He also had his own staff who assisted him with his practice and surgeries, including office staff, nurses, and a physician's assistant,

2

whom his practice employed and paid. (Id.) Finally, Dr. Wojewski leased his own office space. (DASMF ¶ 24; Pl.'s Resp. ¶ 24.)

In the summer of 1996, Dr. Wojewski began to show signs of unusual behavior which necessitated a leave of absence from the Medical Staff. (PSMF ¶ 10.) During this time Dr. Wojewski's behavior worsened, leading him to check himself in to an inpatient program and receive outpatient services at the Menninger Clinic. (PSMF ¶ 11.) Dr. Wojewski was ultimately diagnosed as suffering from Bipolar Disorder, Type I, which is also referred to as manic-depressive disorder. (PSMF ¶ 12.) In September 1996, after undergoing treatment for his condition, Dr. Wojewski sought reinstatement to the RCRH Medical Staff. (PSMF ¶ 13.) RCRH eventually reinstated Dr. Wojewski based upon the recommendations of four psychiatrists who concluded he could safely resume his practice. (Aff. Michael P. Reynolds Supp. Pl.'s Resp. Defs.' Stmt. Mat. Facts ("Reynolds' Aff."), attach. 1.) Robert J. Herbert, M.D., a psychiatrist who treated Dr. Wojewski, noted that if he were to suffer another manic episode it would not emerge abruptly, rather, it would emerge gradually in such a fashion as those people working with him on a daily basis would notice the change. (Reynolds' Aff., attach. 3.) Similarly, George Athey, Jr., Ph.D., concluded that if Dr. Wojewski's bipolar disorder were to emerge it would likely be recognized before a crisis developed. (Reynolds' Aff., attach. 5.)

After his reinstatement, Dr. Wojewski practiced at RCRH without incident through June 2003. (PSMF ¶ 19.) At this time he began displaying signs that he was suffering another manic episode. (PSMF ¶ 20.) Plaintiff informed Dr. Hart of his worsening condition and was granted a leave of absence from the Medical Staff until August 12,

3

2003, when he resumed his duties. (PSMF ¶¶ 21, 24.) By August 16, individuals working in conjunction with Dr. Wojewski noticed him acting in an unusual manner. (PSMF ¶¶ 26-27.) On August 19, Dr. Wojewski commenced a surgical procedure on a patient during which time he suffered a manic episode and was unable to complete the procedure. (PSMF ¶¶ 29-30.) After this episode transpired security removed Dr. Wojewski from the hospital. (PSMF ¶ 30.) This event led to a suspension of plaintiff's privileges at the hospital. (DASMF ¶ 34; Pl.'s Resp. ¶ 34.) On August 22, the Medical Executive Committee ("MEC") recommended that suspension of Dr. Wojewski's privileges continue. (DASMF ¶ 35; Pl.'s Resp. ¶ 35.)

At his request, Dr. Wojewski received a hearing on the decision to suspend his medical privileges. (DASMF ¶ 42; Pl.'s Resp. ¶ 42.) The Hearing Panel heard testimony and received exhibits over a four-day period, ultimately affirming the MEC's recommendation that plaintiff's privileges remain suspended. (Id.) Dr. Wojewski appealed the Hearing Panel's decision to the Appellate Review Committee which confirmed the decision to revoke plaintiff's privileges. (DASMF ¶¶ 47-51; Pl.'s Resp. ¶¶ 47-51.) On July 22, 2004, the RCRH Board of Trustees voted unanimously to terminate Dr. Wojewski's Medical Staff appointment and clinical privileges. (DASMF ¶ 52; Pl.'s Resp. ¶ 52.)

On February 13, 2004, Dr. Wojewski filed a charge of discrimination with the South Dakota Department of Labor, Division of Human Rights ("DHR") and the Equal Employment Opportunity Commission ("EEOC"). (DASMF ¶ 55; Pl.'s Resp. ¶ 55.) Plaintiff then filed a complaint against RCRH with the DHR. (DASMF ¶ 56; Pl.'s Resp.

4

¶ 56.) On March 1, 2004, the DHR issued a "no probable cause" determination, finding that plaintiff was not a covered employee for purposes of South Dakota Codified Law ("SDCL") § 20-13-1(6) and plaintiff did not appeal that decision. (Id.) The EEOC issued plaintiff a Notice of Right to Sue on November 18, 2004. (DASMF ¶ 57; Pl.'s Resp. ¶ 57.) On February 1, 2005, plaintiff filed his complaint in this matter. Defendants filed their motion to dismiss, or, in the alternative, for summary judgment on March 4, 2005. The supporting documents to that motion were filed on April 1, 2005, pursuant to Court Order. Plaintiff filed his response on April 22 and defendants filed their reply on May 9.

## II. Summary Judgment Standard

"Rule 12(b)(6) itself provides that when matters outside the pleadings are presented and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56." Hamm v. Rhone-Poulenc Rorer, Pharms., Inc., 187 F.3d 941, 948 (8th Cir. 1999). Under Rule 56(c), a movant is entitled to summary judgment if the movant can "show that there is no genuine issue as to any material fact and that [the movant] is entitled to a judgment as a matter of law." In determining whether summary judgment should issue, the facts and inferences from those facts are viewed in the light most favorable to the nonmoving party, and the burden is placed on the moving party to establish both the absence of a genuine issue of material fact and that such party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(c); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 585-86, 106 S. Ct. 1348, 1355, 89 L. Ed. 2d 538 (1986). Once the moving party has met this burden, the nonmoving party may not rest on the allegations in the pleadings, but by affidavit or other evidence must set forth specific

facts showing that a genuine issue of material fact exists. See Fed. R. Civ. P. 56(e); Matsushita, 475 U.S. at 586-87, 106 S. Ct. at 1356.

## III. Discussion

Dr. Wojewski claims that when defendant RCRH terminated his privileges at the hospital without providing reasonable accommodations it violated the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. §§ 12101 et seq., (Comp. ¶ 47-69) and the Rehabilitation Act of 1973, 29 U.S.C. §§ 701 et seq., (Comp. ¶¶ 82-91). Plaintiff also alleges numerous state law claims, which include: Count I - breach of hospital policy statement, (Comp. ¶¶ 42-46); Count VI - tortious interference with prospective business advantage, (Comp. ¶¶ 92-97); Count VII - breach of fiduciary duty, (Comp. ¶¶ 98-101); Count VIII - negligent infliction of emotional distress, (Comp. ¶¶ 102-107); and Count IX - intentional infliction of emotional distress, (Comp. ¶¶ 108-113). At the outset, plaintiff asserted in his complaint a claim of retaliation in violation of the ADA (Comp. ¶¶ 70-81) and a claim of violation of the South Dakota Human Relations Act of 1972, SDCL ch. 20-13, (Comp. ¶¶ 114-17), however, plaintiff voluntarily dismissed these claims (Pl.'s Mem. Resp. Defs.' Amended Mem. Supp. Mot. Dis. or Summ. J. ("Pl.'s Mem. Resp.") at 16). Plaintiff also notes that his claim of violation of the Civil Rights Act of 1991 (Comp. ¶¶ 118-21) was not asserted as a substantive claim for recovery, but for purposes of identifying the damages available to plaintiff for defendants' alleged violations of the ADA. (Pl.'s Mem. Resp. at 16.)

### A. Count II: Violation of Title I of the ADA–42 U.S.C. § 12112(a)

"The ADA prohibits employment discrimination against qualified individuals with a disability because of their disability." Belk v. Southwestern Bell Tel. Co., 194 F.3d 946, 949 (8th Cir. 1999). "A 'qualified individual with a disability' is a person with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position." Webb v. Mercy Hosp., 102 F.3d 958, 959 (8th Cir. 1996) (internal quotations and citation omitted). "[T]he ADA protects 'employees' but not independent contractors." Birchem v. Knights of Columbus, 116 F.3d 310, 312 (8th Cir. 1997).

The parties dispute whether Dr. Wojewski was an employee or an independent contractor. Defendants contend Dr. Wojewski's relationship with RCRH was that of an independent contractor, while plaintiff claims he was an employee of RCRH. "In both Title VII and the ADA, Congress adopted a circular definition of 'employee'–an employee is an 'individual employed by an employer.'" Lerohl v. Friends of Minn. Sinfonia, 322 F.3d 486, 489 (8th Cir. 2003) (quoting 42 U.S.C. §§ 2000e(f), 12111(4)). This circular definition has necessitated courts to develop tests to distinguish between independent contractors and employees. One test applied is the "general common law of agency" test which requires courts "to consider a nonexhaustive list of factors derived primarily from the Restatement (Second) of Agency § 220(2) (1958)." Lerohl, 322 F.3d at 489. Another test that emerged was the "economic realities" test. Armbruster v. Quinn, 711 F.2d 1332, 1340 (6th Cir. 1983). This test requires courts to "examine the economic realities underlying the relationship between the individual and the so-called principal in an effort

to determine whether that individual is likely to be susceptible to the discriminatory practices which the act was designed to eliminate." Id. A final test is the hybrid test where "the term 'employee' is construed in light of general common-law concepts, taking into account the economic realities of the situation." Wilde v. County of Kandiyohi, 15 F.3d 103, 105 (8th Cir. 1994).

Plaintiff cites to the case of Ross v. William Beaumont Hospital, 678 F. Supp. 655 (E.D. Mich. 1988), to support his assertion that he was an employee of RCRH and not an independent contractor. In *Ross* the court determined that the plaintiff, a female physician with staff privileges at the defendant hospital, was an employee for purposes of her sexual discrimination claim. Id. at 675. *Ross* applied the economic realities test as articulated by the Sixth Circuit in *Armbruster*. Id. In applying the economic realities test, the court in *Armbruster* held "that the term employee in Title VII must be read in light of the mischief to be corrected and the end to be attained." Armbruster, 711 F.2d at 1340 (internal quotations and citations omitted). The court reached that decision by applying the definition of "employee" as set forth in the Fair Labor Standards Act, 29 U.S.C. § 215(a)(3), which was "the broadest definition ever included in any one act." Id.

The opinions in *Ross*, and especially *Armbruster*, are favorable to Dr. Wojewski's position; however, opinions subsequently delivered by the Sixth Circuit, and, more importantly, the Eighth Circuit, have rendered questionable the persuasive value of *Ross* and *Armbruster*. In 2004, the Sixth Circuit decided Shah v. Deaconess Hospital, 355 F.3d 496 (6th Cir. 2004), an action where Shah, a general surgeon, was denied surgical privileges at Deaconess. Id. at 497. Shah sued Deaconess claiming it discriminated

8

against him based on his national origin and age. Id. In concluding that Shah was not an employee for purposes of the federal employment discrimination statutes the court acknowledged its previous decision in *Armbruster* where it applied the "economic realities" test, but stated that "in more recent cases, we have made it clear that we prefer the common law agency analysis." Id. at 499. Additionally, in *Wilde* the Eighth Circuit analyzed the reasoning in *Armbruster* and specifically declined to apply the economic realities test. Wilde, 15 F.3d at 105-06. Finally, the Supreme Court case on which *Wilde* based its decision not to follow the economic realities test, Nationwide Mutual Insurance Co. v. Darden, 503 U.S. 318, 112 S. Ct. 1344, 117 L. Ed. 2d 581 (1992), seems to preclude application of the economic realities test.

The test applied in the Eighth Circuit is the hybrid test, which requires courts to analyze the factors set forth by the general common law of agency along with the "economic aspects of the parties' relationship." Lerohl, 322 F.3d at 489; see also Birchem, 116 F.3d at 312-13; Wilde, 15 F.3d at 105. "In applying the common law of agency test, the Supreme Court looks at the large number of factors that define the parties' total contractual relationship, no one of which is determinative." Birchem, 116 F.3d at 312.

> In determining whether a hired party is an employee under the general common law of agency, we consider the hiring party's right to control the manner and means by which the product is accomplished. Among the other factors relevant to this inquiry are the skill required; the source of the instrumentalities and tools; the location of the work; the duration of the relationship between the parties; whether the hiring party has the right to assign additional projects to the hired party; the extent of the hired party's discretion over when and how long to work; the method of payment; the hired party's role in hiring and paying assistants; whether the work is part of the regular business of the hiring party; whether the hiring party is in business; the provision of employee benefits; and the tax treatment of the hired party. . . .

9

Lerohl, 322 F.3d at 489 (quoting Cmty. for Creative Non-Violence v. Reid, 490 U.S. 730, 751-52, 109 S. Ct. 2166, 104 L. Ed. 2d 811 (1989)). Factors considered in addition to the common law factors include: "how the work relationship may be terminated, whether the worker receives yearly leave, whether the worker accrues retirement benefits, and whether the hiring party pays social security taxes." Wilde, 15 F.3d at 105.

Applying Dr. Wojewski's situation to the above-listed factors reveals that plaintiff was an independent contractor and not an employee. According to the undisputed facts: Dr. Wojewski billed patients directly for his services and patients paid him directly for his work, including the work he performed on call, (DASMF ¶ 19; Pl.'s Resp. ¶ 19); RCRH did not bill patients for Dr. Wojewski's services, nor did the hospital pay Dr. Wojewski for his services, (DASMF ¶ 20; Pl.'s Resp. ¶ 20); RCRH did not issue a form W-2 or 1099 to Dr. Wojewski, nor did it pay his social security or other benefits, such as health or malpractice insurance, (DASMF ¶ 21; Pl.'s Resp. ¶ 21); Dr. Wojewski had his own staff who assisted him with his practice and surgeries, including office staff, nurses, and a physician's assistant, whom his practice employed and paid, (DASMF ¶ 21; Pl.'s Resp. ¶ 21); and Dr. Wojewski leased his own office space, (DASMF ¶ 24; Pl.'s Resp. ¶ 24). These factors all indicate Dr. Wojewski is an independent contractor.

Plaintiff argues he was an employee because the hospital exerted greater control over his "livelihood and profession by virtue of the Letter of Agreement/Conditions of Reappointment" which established certain requirements on reappointment of his Medical Staff membership and privileges. (Pl.'s Mem. Resp. at 8-9.) The Court disagrees. The Letter of Agreement was implemented pursuant to hospital policy to protect "the best

interests of patient safety." (Reynolds' Aff., attach. 36.) The Court also finds persuasive the reasoning stated by the Fourth Circuit on this issue: "Because of the overarching demands of the medical profession, the tension in professional control between doctors and hospitals for medical services rendered at hospitals is not, we believe, a reliable indicator of whether the doctor is an employee or an independent contractor at the hospital." Cilecek v. Inova Health Sys. Servs., 115 F.3d 256, 262 (4th Cir. 1997). In addition to the Fourth Circuit in Cilecek, the holdings in several other circuit court opinions, involving physicians who lost hospital privileges and filed suit under federal discrimination statutes, support the conclusion that Dr. Wojewski was an independent contractor. See Diggs v. Harris Hosp.-Methodist, Inc., 847 F.2d 270, 271 (5th Cir. 1988); Shah, 355 F.3d 496, 500 (6th Cir. 2004); Alexander v. Rush N. Shore Med. Ctr., 101 F.3d 487, 493 (7th Cir. 1997); Wilson v. Muckala, 303 F.3d 1207, 1220 (10th Cir. 2002). Based upon an analysis of plaintiff's case with the factors listed in *Wilde*, and relying on the reasoning in the above listed cases, it is the opinion of the Court that Dr. Wojewski's relationship with RCRH was that of an independent contractor and not an employee. Title I of the ADA, protecting "employees," but not independent contractors, does not apply to Dr. Wojewski as an independent contractor. Thus, Count I of plaintiff's complaint must be dismissed.

### B.    Count V: Violation of the Rehabilitation Act–29 U.S.C. § 794(a)

Dr. Wojewski claims defendants terminated his privileges at RCRH in violation of the Rehabilitation Act of 1973. "The Rehabilitation Act became effective in 1973, and

11

§ 504 of the act provides that 'no otherwise qualified individual with a disability' shall 'be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.'" Gorman v. Bartch, 152 F.3d 907, 911 (8th Cir. 1998) (quoting 29 U.S.C. § 794(a)). "To prevail on a claim under § 504, a plaintiff must demonstrate that: (1) he is a qualified individual with a disability; (2) he was denied the benefits of a program or activity of a public entity which receives federal funds, and (3) he was discriminated against based on his disability." Id. "A 'qualified individual with a disability' is broadly defined as any person who 'meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity.'" Id. at 912. "Rehabilitation Act claims are analyzed in a manner similar to ADA claims except that the Rehabilitation Act imposes a requirement that a person's disability serve as the *sole* impetus for a defendant's adverse action against the plaintiff." Amir v. St. Louis Univ., 184 F.3d 1017, 1029 n.5 (8th Cir. 1999).

Defendants assert that plaintiff's Rehabilitation Act claim, similar to his claim under Title I of the ADA, should be dismissed because Dr. Wojewski is not an employee of RCRH. In support of this contention, defendants cite to Beauford v. Father Flanagan's Boys' Home, 831 F.2d 768 (8th Cir. 1987), where the court of appeals was called upon to interpret the application of the Rehabilitation Act. The court stated "that section 504 was designed to prohibit discrimination within the ambit of an *employment relationship* in which the employee is potentially able to do the job in question." Id. at 771 (emphasis added). The court also took into consideration the Department of Health and Human

12

Services regulations which establish that the definition of a "qualified handicapped person" is "divided into four headings: (1) employment[,] (2) public preschool, elementary, secondary or adult education, (3) post-secondary and vocational educational services and (4) other services." Id. at 772 (citing 45 C.F.R. § 84.4(k)). In the employment context the court stated a "qualified handicapped person" is "a handicapped person who, with reasonable accommodation, can perform the essential functions of the job in question." Id. at 771.

Plaintiff asserts that even if Dr. Wojewski is not an employee of RCRH he could still assert his Rehabilitation Act claims as an independent contractor. Plaintiff makes this argument in reliance on Menkowitz v. Pottstown Memorial Medical Center, 154 F.3d 113 (3$^d$ Cir. 1998), *rev'g* 1997 WL 793010, No. Civ. A. 97-2669 (E.D. Pa. Dec. 2, 1997). In Menkowitz the plaintiff filed suit alleging the defendants violated the ADA and Rehabilitation Act when they terminated his hospital privileges. Menkowitz, 154 F.3d at 115. At the district court level the defendants moved to dismiss Menkowitz's Rehabilitation Act count for failure to state a claim because he did not allege he was suspended "solely by reason of . . . his disability." Menkowitz, 1997 WL 793010, *4. The district court granted defendants' motion to dismiss because of plaintiff's omission and plaintiff appealed. Menkowitz, 154 F.3d at 115. In analyzing Menkowitz's appeal, the Third Circuit noted that "[t]he parties do not dispute at this stage of the litigation that appellant has sufficiently alleged he is a 'handicapped individual,' he is 'otherwise qualified,' and the hospital receives federal financial assistance." Id. at 123-24.

The only issue analyzed by the Third Circuit was whether Menkowitz "was excluded from the position sought solely by reason of his disability." Id. at 124. This factor differentiates the *Menkowitz* case from plaintiff's case because defendants are contesting whether Dr. Wojewski is a "qualified individual" for purposes of plaintiff's Rehabilitation Act claim. As such, the Court is more inclined to agree with the reasoning in *Beauford* where the Eighth Circuit stated the Rehabilitation Act was designed to prohibit discrimination in an employment relationship. Thus, having already determined that there was not an employment relationship between Dr. Wojewski and RCRH, the Rehabilitation Act does not apply to Dr. Wojewski's situation and Count V of plaintiff's complaint must be dismissed.

### C.     Count III: Violation of Title III of the ADA–42 U.S.C. § 12182(a)

As a general rule, Title III of the ADA provides: "No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation." 42 U.S.C. § 12182(a). Dr. Wojewski claims defendants terminated his privileges at RCRH in violation of Title III. Defendants argue Title III does not apply to plaintiff because he was not a customer or client of RCRH and was not denied any privilege or service RCRH made available to the public. Plaintiff argues Title III applies to all individuals and is not limited to just clients or customers.

In support of their respective positions the parties point to PGA Tour, Inc. v. Martin, 532 U.S. 661, 121 S. Ct. 1879, 149 L. Ed. 2d 904 (2001), where the Supreme Court

was required to apply Title III of the ADA. The plaintiff in that case was Casey Martin, a professional golfer, who suffers from a degenerative circulatory disorder that inhibits his ability to walk an 18-hole golf course. Martin, 532 U.S. at 668, 121 S. Ct. at 1885-86. While in college, the National Collegiate Athletic Association waived its rules and permitted Martin to ride a cart when he competed. Id. at 668, 121 S. Ct. at 1886. Upon Martin's entrance into the PGA Tour's qualifying school, or Q-School, Martin was similarly permitted to ride a cart during the first two stages, however, he was denied the use of a golf cart during the third stage. Id. at 669, 121 S. Ct. at 1886. That denial is what prompted litigation and the Supreme Court's ultimate decision that golfers who pay to compete in Q-School are clients or customers of the PGA Tour. Id. at 679-80, 121 S. Ct. at 1891-92. In reaching that conclusion, however, the Court declined to expressly determine whether the scope of Title III as a whole is limited to just clients or customers of public accommodations or all individuals. Id.

Although the scope of Title III was not specifically addressed in the majority's opinion, it was specifically addressed in the dissent authored by Justice Scalia and joined by Justice Thomas. Id. at 691-705, 121 S. Ct. at 1898-1905 (Scalia, J., dissenting). Justice Scalia claimed that Title III only applies to particular persons and places: "The place must be a 'place of public accommodation,' and the person must be an 'individual' seeking 'enjoyment of the goods, services, facilities, privileges, advantages, or accommodations' of the covered place. Id. at 692, 121 S. Ct. at 1898. In explaining why Title III was meant to only apply to customers, Justice Scalia lists several of the places that qualify as public accommodations and analyzes the language Title III uses in describing these entities.

> Section 12181(7) lists 12 specific types of entities that qualify as "public accommodations," with a follow-on expansion that makes it clear what the "enjoyment of the goods, services, etc.," of those entities consists of--and it plainly envisions that the person "enjoying" the "public accommodation" will be a *customer*. For example, Title III is said to cover an "auditorium" or "other place of public gathering," § 12181(7)(D). Thus, "gathering" is the distinctive enjoyment derived from an auditorium; the persons "gathering" at an auditorium are presumably covered by Title III, but those contracting to clean the auditorium are not. Title III is said to cover a "zoo" or "other place of recreation," § 12181(7)(I). The persons "recreating" at a "zoo" are presumably covered, but the animal handlers bringing in the latest panda are not. The one place where Title III specifically addresses discrimination by places of public accommodation through "contractual" arrangements, it makes clear that discrimination against the other party to the contract is not covered, but only discrimination against "clients or customers of the covered public accommodation that enters into the contractual, licensing or other arrangement." § 12182(b)(1)(A)(iv). And finally, the regulations promulgated by the Department of Justice reinforce the conclusion that Title III's protections extend only to customers. "The purpose of the ADA's public accommodations requirements," they say, "is to ensure accessibility to the goods offered by a public accommodation." 28 CFR, ch. 1, pt. 36, App. B, p. 650 (2000). Surely this has nothing to do with employees and independent contractors.

Id. at 693, 121 S. Ct. at 1898-99. Justice Scalia further opined that it would be unreasonable for courts to interpret Title III as applying to *all* employees and *all* independent contractors of places of public accommodation, because it would render impotent the exemptions adopted in Title I.

> It is an entirely unreasonable interpretation of the statute to say that these exemptions so carefully crafted in Title I are entirely eliminated by Title III (for the many businesses that are places of public accommodation) because employees and independent contractors "enjoy" the employment and contracting that such places provide. The only *distinctive* feature of places of public accommodation is that they accommodate the *public,* and Congress could have no conceivable reason for according the employees and independent contractors of such businesses protections that employees and independent contractors of other businesses do not enjoy.

16

Martin, at 693-94, 121 S. Ct. at 1899; see 42 U.S.C. § 12111(5)(A) (defining "employer" as a person with 15 or more employees); Birchem, 116 F.3d at 312-13 (holding the ADA does not protect independent contractors).

Aside from their reliance on the *Martin* decision, defendants cite to Bauer v. Muscular Dystrophy Association, 268 F. Supp. 2d. 1281, 1292 (D. Kan. 2003), to support their position and plaintiff again cites to *Menkowitz*. While differing factually, both cases discuss the scope of Title III. In *Menkowitz*, the Third Circuit held that "a medical doctor with staff privileges . . . may assert a cause of action under Title III of the ADA as an 'individual' who is denied the 'full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation.'" Menkowitz, 154 F.3d at 122. The *Menkowitz* opinion, however, was rendered before *Martin* was decided and is disagreed with by *Bauer*. Bauer, 268 F. Supp. 2d at 1293 n.4.

The plaintiffs in *Bauer*, who have disabilities due to muscular dystrophy, had served from 1995 through 2002 as volunteers at a camp run by the Muscular Dystrophy Association ("MDA"). Id. at 1282, 1286. In September 2002, the new camp director informed the plaintiffs that they could not be volunteer counselors because of MDA policy which requires all volunteers to be capable of lifting and caring for a camper. Id. at 1286-87. The plaintiffs then filed suit claiming the MDA unlawfully discriminated against them in violation of Title III. Id. at 1282. The district court in *Bauer*, relying substantially on Justice Scalia's dissent in *Martin*, concluded that the plaintiffs were not entitled to relief under Title III. Id. at 1291. The court stated:

> [T]he right of equal access to the "goods, services, facilities," et cetera, guaranteed by Title III is most reasonably construed to mean the goods, services

17

and facilities *offered to customers or patrons* of the public accommodation, not to individuals who work at the facility, whether those workers be paid employees, independent contractors, or unpaid volunteers.

Id. In reaching this conclusion the district court rejected the reasoning set forth in *Menkowitz*, finding that it "unnecessarily rejects the historical understanding that public accommodation laws are designed to protect customers or patrons" and "injects Title III standards into employment and agency questions and thereby essentially re-writes the scope of Title I coverage." Id. at 1293 n.4. Dr. Wojewski does not qualify as an "individual" for purposes of Title III because he is not a client or customer of RCRH. Thus, Title III of the ADA does not apply to Dr. Wojewski's situation and Count III of plaintiff's complaint must be dismissed.

## IV. Conclusion

Pursuant to 28 U.S.C. § 1367(c)(3), the Court declines to exercise jurisdiction over plaintiff's remaining claims, Counts I, VI, VII, VIII, and IX, all of which allege violations of the laws of the State of South Dakota. Accordingly, it is hereby

ORDERED that defendants' motion to dismiss (Docket #34) is denied as moot in light of the Court's consideration of matters outside the pleadings.

IT IS FURTHER ORDERED that defendants' motion for summary judgment (Docket #34), as to Counts II, III, and V, is granted. Counts II, III, and V will be dismissed with prejudice.

Dated this 13 day of June, 2005.

BY THE COURT:

/s/ Richard H. Battey
RICHARD H. BATTEY
UNITED STATES DISTRICT JUDGE